# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

KENNETH L. PEACHMAN,          )
                                      )

        Petitioner,           )
                                      )

v.                             )    No. 3:15-cv-0638
                                      )

TAMMY FORD, Warden,         )    Judge Nixon
                                      )

        Respondent.      )

## <u>MEMORANDUM OPINION</u>

Petitioner Kenneth Peachman, a prisoner in state custody, filed a timely *pro se* petition and supplemental petition under 28 U.S.C. § 2254 for the writ of habeas corpus (ECF Nos. 1, 17), challenging the 2008 judgment of the Montgomery County Criminal Court convicting him on one count of second-degree murder and sentencing him to twenty-four years and six months of incarceration. The petitioner also filed a motion for the appointment of counsel (ECF No. 2) and motion for "discovery and inspection" (ECF No. 3). The respondent filed an answer (ECF No. 36), along with a copy of the underlying state-court record (ECF No. 35).

Because a federal court must presume the correctness of a state court's factual findings unless the petitioner rebuts this presumption with "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), and because the issues presented herein can be resolved with reference to the state-court record, the Court finds that an evidentiary hearing is not necessary. *See Schriro v. Landrigan*, 550 U.S. 464, 474 (2007) (holding that if the record refutes a petitioner's factual allegations or otherwise precludes habeas relief, the district court is not required to hold an evidentiary hearing (citing *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998))).

Appointment of counsel in a habeas proceeding is mandatory only if the district court determines that an evidentiary hearing is required. *Lemeshko v. Wrona*, 325 F. Supp. 2d 778, 787 (E.D. Mich. 2004); Rule 8(a), Rules Gov'g § 2254 Cases. Thus, the appointment of counsel in a habeas case typically occurs only in "exceptional" circumstances. *Lemeshko*, 325 F. Supp. 2d at 788 (citations omitted). Exceptional circumstances do not exist in this case, and the Court will deny the motion to appoint counsel. The motion for inspection and discovery will be denied as moot.

Upon consideration of the amended petition, answer, and the state-court record, the Court finds for the reasons set forth herein that the petitioner is not entitled to relief on the grounds asserted. The habeas petition will be denied and this matter dismissed.

## I. PROCEDURAL BACKGROUND

The petitioner, along with seven co-defendants, was indicted in Count One of a multi-count indictment for first degree, premeditated murder, in the Montgomery County Circuit Court, Case No. 40700798. On July 18, 2007, the petitioner pleaded guilty on Count One to the lesser-included offense of second-degree murder, with sentencing left to the discretion of the trial court. (ECF No. 35-1, at 15.) This sentence was to be consecutive to a seven-year probation-violation sentence the petitioner was already serving.

In the same court and on the same day, the petitioner was charged in an Information with solicitation to commit first-degree murder. (ECF No. 35-12, at 4 (7/18/2007 Information, Case No. 40700817).) Also on the same day, the petitioner signed a waiver of his right to require a Grand Jury investigation and indictment, and pleaded guilty to the charge. (ECF No. 35-12, at 5, 6 (Waiver and Guilty Plea).) The plea included a stipulated sentence of eight years as a standard offender, to be served consecutively to whatever sentence would be imposed in Case No.

40700798. (*Id.* at 6.) Judgment in Case No. 40700817 was also entered on July 18, 2007. (ECF No. 35-12, at 14.)

In September 2007, the petitioner filed two *pro se* motions to withdraw his plea in Case No. 40700798. (ECF No. 35-1, at 16, 18.) The trial court denied the motions after a hearing. (ECF Nos. 35-1, at 16, 23–24.) On April 9, 2008, the petitioner was sentenced in Case No. 40700798 to twenty-four years and six months in prison. (Am. Judgment, ECF No. 35-12, at 15.) The judgment reflects that the petitioner, as a violent offender, would be required to serve his sentence at 100%. (*Id.*) The conviction and sentence were affirmed on direct appeal. *State v. Peachman* ("*Peachman I*"), No. M2008-01057-CCA-R3-CD, 2010 WL 27880 (Tenn. Ct. Crim. App. Jan. 6, 2010), *perm. app. denied* (Tenn. May 12, 2010).

On July 20, 2011, the petitioner filed a *pro se* petition for post-conviction relief in the state trial court. (ECF No. 35-12, at 17.) The court appointed counsel (ECF No. 35-12, at 48), and also found by agreement of the parties that the post-conviction petition was timely. (ECF No. 35-12, at 52.)[1] Counsel filed an amended petition that simply incorporated the arguments asserted in the *pro se* petition. (ECF No. 35-12, at 50.) Substitute counsel was appointed in February 2013 (ECF No. 35-12, at 53), who filed a second amended petition raising additional claims. (ECF No. 35-12, at 55.) After conducting a hearing at which the petitioner and his trial attorney testified, the trial court entered an order denying the petition. (ECF No. 35-12, at 62.) That decision was affirmed as well. *Peachman v. State* ("*Peachman II*"), No. M2013-02171-

---

[1] The appellate court noted that the petitioner had attached to his *pro se* petition "a letter from his appellate counsel stating appellate counsel's promise to file a petition for post-conviction relief in the event of the supreme court's denial of the petitioner's application for permission to appeal this court's ruling affirming the denial of the petitioner's motion to withdraw his plea" as well as "letters that the petitioner had written to appellate counsel and to appellate counsel's partner inquiring about the status of his petition for post-conviction relief and a letter from the Montgomery County Circuit Court Clerk noting that no petition for post-conviction relief had been filed in the petitioner's case." *Peachman II*, 2014 WL 2567136, at *1.

CCA-R3-PC, 2014 WL 2567136 (Tenn. Ct. Crim. App. June 6, 2014), *perm. app. denied* (Tenn.

Sept. 25, 2014).[2]

## II.    STATEMENT OF FACTS

At the guilty plea submission hearing on July 18, 2007, the State offered the following

factual basis in support of the petitioner's guilty plea:

> [A]t about 3:00 a.m. in the morning of July 14, of last year—actually, it started on
> July 13th at a bar known as Tipper's. There was an altercation between various
> what we will refer to as Gang Members, one being the Birchwood Boys with
> which the Defendant was associated with [sic], and the Greenwood Boys, which
> stayed in the area of Greenwood and Caldwell Lane. There was some altercation
> at the Club, words were exchanged, and I think one person from the Greenwood
> perhaps tried to hit [Defendant] according to the statements that I have. However,
> everyone left. However, two of the female members that were with the
> Birchwood, Defendant's gang, went to the Dodge Store. As they were leaving
> Dodge Store, an [Alonza] Slayden, I believe is one of the individuals, he is listed
> as the victim on the attempted murder [charge] and I think one of the [Rugante]
> twins is the other individual? Maybe another one? Is driving into the parking lot
> of Dodge's and made a statement to the girls to the effect of, tell your boyfriends
> they're a bunch of bitches. If they really want to get down instead of firing shots
> up in the air, come to Greenwood. We are ready to die.

> They go—the girls leave Dodge Store and go to a trailer that is occupied by all
> nine [sic] of these defendants at this point in time. It actually belongs to Deon
> Murray. There is some discussion about going to Greenwood. Another individual
> by the name of Ronald Cowling is called by Jecory Leonard, a co-defendant, to
> say we are going to go to Greenwood to take care of business. Cowling, from all

---

[2] The petitioner's initial state post-conviction proceeding challenged the sentences
entered in Case Nos. 40700798 *and* 40700817 (*see* ECF No. 32-12, at 17), and all post-
conviction proceedings in the trial and appellate courts likewise reflected both case numbers in
their case captions. *See, e.g., Peachman II*, 2014 WL 2567136, Case Caption (noting that the
opinion addressed an "Appeal from the Circuit Court for Montgomery County, Nos. 40700798,
40700817"). However, the post-conviction appellate court also noted that, while the petition and
appeal purported to pertain to both sentences, "very little mention was made of the petitioner's
conviction of solicitation of first degree murder. His claim regarding release eligibility
percentage, in fact, has no application to that conviction." *Id.* at *1 n.1.

The petition in this Court similarly reflects the petitioner's intention to challenge the
convictions entered in both cases. (*See* ECF No. 1, at 1 (listing both case numbers).) However,
the petitioner only refers to his sentence of 24 and ½ years and not the 8-year sentence for
solicitation of first-degree murder. The Court construes the petition as challenging only the
conviction and sentence in Case No. 40700798 for second-degree murder.

accounts, including the Defendant himself, as well as Cowling, says that he told them not to go, it was a bad idea, stay home.

Instead, the defendants loaded up in three cars. One car was driven by Jermaine Smith, it belonged to Deontrea Milligan. Milligan was in the car with him with a gun. Another car was driven by Jecory Leonard. That car was occupied by [John] Buggs, [Tyrece] Lowry, and Deon Murray. The other car was driven by Roger Harper, and it was occupied by the Defendant and Gregory Shawn Robinson.

The cars proceeded to the area—the Greenwood area, via Edmondson Ferry Road. As they rolled up to the stop sign that intersects with Caldwell Lane, the cars—a couple of cars cross into the intersection, slowed down, and started firing shots. The victim, Sylvester Hockett, Jr., was on the porch of 208 Caldwell Lane, which is approximately [one] hundred and sixty feet from the intersection, Your Honor.

There were a couple of people closer to the corner, much closer to the cars, and the others were up, as I said, [one] hundred and fifty to [one] hundred and sixty feet. The front door of 208 was just pounded by shotgun pellets as well as other rounds. A number of casings—I think at least two shotgun shells were recovered in the intersection.

When the shots began, the people that were on the porches took off running between 208 and 210. As Mr. Hockett was running away, he was struck by what turned out to be a single shotgun pellet in the back of his head, and he died from those injuries.

All defendants were apprehended pretty shortly after this. All but two initially gave a statement implicating themselves. At that point in time, it was the belief of everyone that the victim had been killed by a .380. All individuals identified who had guns and what guns they had. All defendants put the gun in the hands of [Defendant], but for [Defendant]. We also have a witness that was a female that was simply at the trailer, is not a defendant, not a co-conspirator, and she states that when they left the trailer, the gun was in [Defendant's] hands. Since then, we have gotten statements from three of the defendants who are willing to testify that [Defendant] did, in fact have the shotgun. . . . [T]he pellet was recovered from the victim. It was a shotgun pellet and the Medical Examiner would testify the two casings, two shotgun shell casings that were found at the scene were matched to a shotgun that was recovered under the couch in the trailer of Deon Murray. . . . That's the only shotgun found and that's the only shotgun alleged to have been taken and based on the evidence recovered, that is consistent—again, there were numerous shell casings, .380's and other guns, but the shotgun shells indicated that there were two shots fired.

There was also reason to believe, and the State has not made a deal with him, but Jecory Leonard stated that when . . . [Defendant] got out of the car, he kept saying, I got him, I got him, I know I got him, I saw him fall.

*Peachman I*, 2010 WL 27880, at *1–2 (alterations in original).

The appellate court summarized the proceedings at the plea hearing and on the petitioner's motion to withdraw his plea as follows:

> The trial court explained to Defendant that under the terms of the negotiated plea agreement, the length of his sentence for second degree murder would be determined after a sentencing hearing, and Defendant stated that he understood. Defendant acknowledged that the range of punishment as a Range One, standard offender, was fifteen to twenty-five years, and that he would be required to serve one hundred percent of his sentence as a violent offender. The trial court explained the constitutional rights Defendant was foregoing by entering a plea of guilty, and Defendant stated that he understood. The trial court asked Defendant if he "unlawfully, feloniously, and knowingly kill[ed] [the victim]," and Defendant responded "Yes, sir." The trial court accepted Defendant's plea of guilty to second degree murder in count one of the indictment.
>
> On September 12, 2007, Defendant filed a *pro se* motion to withdraw his plea alleging that (1) he received ineffective assistance of counsel during the guilty plea submission hearing; (2) trial counsel coerced Defendant into entering his plea; (3) his plea was involuntarily entered because of the coercion and erroneous advice of trial counsel; and (4) "exculpatory evidence (NOT SPECIFIED) (sic) was withheld." Defendant contended generally that his plea of guilty created a "manifest of injustice," and that he was "a victim of vindictive and selective prosecution."
>
> On September 19, 2007, Defendant filed a second motion to withdraw his guilty plea, adding the allegations that trial counsel promised Defendant he would "get a lesser charge and lesser time" if he entered a plea of guilty, and that trial counsel told Defendant "his life was over with."
>
> Defendant contended that if he proceeded to trial, "his counsel was going to mislead and withhold evidence as he is doing now." Defendant's motion to remove counsel was granted on September 26, 2007, and new counsel was appointed to represent him at the hearing on his motion to withdraw his guilty plea.
>
> At the hearing, Defendant testified that he thought he would be required to serve thirty percent, instead of one hundred percent, of his sentence for second degree murder. Defendant stated that on the plea agreement under the section, "type felony offender," the box for "Mitigated-30%" was checked. Defendant said that he did not understand the meaning of "open plea-100% RED" which was handwritten under the space for "punishment." Defendant said that he spoke with trial counsel on the morning of the guilty plea submission hearing. Trial counsel told Defendant that he (Defendant) "had to think about it that day," because Defendant "had to cop out that day." Defendant reiterated that he accepted the

plea offer because he thought he would serve only thirty percent of his sentence for second degree murder. Defendant said that he spoke with his mother after the hearing and learned that he would have to serve a minimum of eight-five percent of his sentence. Defendant stated that he was not guilty of the charged offense, and he only entered a plea of guilty because he thought it was the "best deal."

On cross-examination, Defendant stated that at the guilty plea submission hearing, he did not hear the trial court inform him that he would have to serve one hundred percent of his sentence. Defendant acknowledged that his two motions to withdraw his plea did not raise an allegation concerning the percentage of his sentence he would have to serve. At the guilty plea submission hearing, Defendant also entered a plea of guilty . . . to solicitation of the first degree murder of Tyrece Lowry, one of Defendant's co-defendants and a potential witness against Defendant, in case no. 40700798 after a letter from Defendant to "Ruby" had been intercepted by jail personnel on July 10, 2007. Defendant denied that the [solicitation] charge . . . played any role in his decision to enter a plea of guilty in case no. 40700798.

Defendant acknowledged that he cooperated with law enforcement officials after the guilty plea submission hearing and gave information about members of his gang concerning drug deals. Defendant agreed that he hoped his cooperation would reflect favorably on the length of his sentence in case no. 40700798, the second degree murder case.

The State introduced a letter from Defendant to the victim's mother which was written on July 23, 2007, as an exhibit at the hearing. In the letter, Defendant apologized for the victim's death and asked for forgiveness. Defendant wrote, "It was two things [I] had to do and now there [sic] both complete, and that was come forward and admit my guilt like a man and write you and apologize." At the hearing, however, Defendant denied that he had killed the victim, and he stated that he was only apologizing in the letter "for being involved with the situation." Defendant said that he agreed to enter a plea of guilty to second degree murder because he knew, if he went to trial, that he would lose because his trial counsel was not "trying to help [him] at all." On redirect examination, Defendant stated he was willing to risk a higher sentence if he was allowed to withdraw his plea.

Trial counsel testified that he had practiced criminal law for approximately eighteen years and was appointed to represent Defendant on the first degree murder charges. Trial counsel said that he met with Defendant between eight and twelve times, and Defendant wrote him numerous letters. Trial counsel acknowledged that he thought Defendant would not fare well if the case proceeded to trial. Trial counsel said that there was a heightened sense of public outrage against gang violence in Montgomery County during the summer Defendant's case was scheduled for trial. Trial counsel acknowledged that he learned of the pending solicitation of first degree murder charge from the State,

and he agreed not to speak with Defendant about the matter until Defendant's cell mate, who had agreed to wear a wire tape, was placed in protective custody.

Trial counsel stated that before he was charged with solicitation, Defendant wanted to proceed to trial on the murder charges. Trial counsel said that Defendant insisted that he was innocent of the charges. Trial counsel said that initially he was "not impressed with the letter" to "Ruby" because it was unsigned. Trial counsel then listened to the taped conversations between Defendant and his cell mate in which Defendant admitting writing the letter and calling for the murder of Mr. Lowry. Trial counsel met with Defendant and told him about the taped conversations. Defendant told trial counsel, "Go back and tell that lady we'll take the deal."

Trial counsel acknowledged that the initial offer of settlement included an agreed upon sentence of between fifteen and twenty years. After the solicitation charge, the State altered its offer to include an "open" plea with a sentence of between fifteen and twenty-five years, with an agreed upon sentence of eight years for the solicitation charge. Trial counsel stated that it was his recollection that Defendant was aware that the sentence for a second degree murder charge would be served at one hundred percent because Defendant repeatedly asked trial counsel to get the State to accept a lesser included offense that could be served at thirty percent. Trial counsel stated that he facilitated Defendant's decision to speak with investigating officers about gang activities in Montgomery County but later learned that Defendant had not revealed any useful information. Trial counsel stated that he had a good relationship with Defendant throughout the guilty plea submission hearing.

*Id.* at *2–4.

## III.  ISSUES PRESENTED FOR REVIEW

In his initial petition in this Court (ECF No. 1), the petitioner asserts that:

(1) trial counsel refused to let the petitioner hear the wire tapes as requested by petitioner;

(2) trial counsel failed to provide the petitioner with any discovery information about the state's purported witness against him, D'Angelo Marquez Jenkins;

(3) trial counsel failed to provide a complete copy of the state's discovery or the "opportunity to sit down with Counsel outside of the Courtroom environment, and go over or discuss the case and the evidence against him" (ECF No. 1, at 4);

(4) trial counsel failed to file a motion to suppress statements or a motion to exclude evidence of the shotgun shell casing and did not explain to the petitioner why not;

(5) the petitioner was "never satisfied with the representation given by Counsel" and even went so far as to file a *pro se* motion to withdraw the guilty plea on the basis that counsel had not fully discussed or explained the evidence to him prior to his entering a guilty plea (ECF No. 1, at 5);

(6) trial counsel forced him to plead guilty by telling him that if he did not, he "would never see the light of day again" (*id.*);

(7) trial counsel failed to explain what kind of sentence he would receive on the second-degree murder charge or to explain that he would have to serve the sentence at 100%;

(8) trial counsel admitted at the hearing on the motion to withdraw the guilty plea that he could not remember whether he discussed with his client the fact that he would have to serve 100% of the sentence for second-degree murder and could not recall the exact conversation with his client on that topic;

(9) appointed counsel did not adequately explain sentencing issues to the petitioner prior to the sentencing hearing; and

(10) trial counsel never at any time filed a motion or petitioned the trial court for a hearing on the petitioner's competency and ability to understand the criminal proceedings against him; and

(11) appellate counsel was ineffective for failing to meet with the petitioner prior to filing the appellate brief.

In a supplemental petition (ECF No. 17), dated September 21, 2015 but not received by the Court until October 26, 2015, the petitioner further asserts that:

(12) the petitioner did not enter his plea to second-degree murder knowingly, voluntarily and intelligently because the indictment was not resubmitted to the Grand Jury, as a result of which the petitioner was not actually charged with second-degree murder, and there is no indictment or victim for the second-degree murder conviction;

(13) trial counsel refused to give the petitioner a copy of the Brady/discovery material and forced him to plead guilty without reviewing the evidence;

(14) trial counsel was ineffective for failing to bring to the court's attention that the indictment in case number 40700798 was not submitted back to the Grand Jury for the second-degree murder plea/conviction; and

(15) trial counsel was ineffective for failing to call expert witnesses to testify about the petitioner's mental condition at the time of the offense;

## IV.    STANDARD OF REVIEW

### A.    Exhaustion and Procedural Default

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal district court may not entertain a petition for the writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine designed to promote comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must]

provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once a petitioner's federal claims have been raised in the highest state court available,[3] the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). Moreover, if a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose v. Lundy*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under AEDPA).

If, however, an unexhausted claim would be procedurally barred under state law, for instance by a statute of limitations or a state rule barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted (because it was not presented to a state court for review), and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d

---

[3] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 311 (2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

### B.  Fully Exhausted Claims

Even when a petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254 raises claims that have been properly exhausted in the state courts, this Court's review of the state court's resolution of those issues remains quite limited. First, this Court may "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, a claim asserting only a violation of state law, even if fully exhausted, is not cognizable in federal habeas corpus. *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Further, under § 2254(d),

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [this Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (citation omitted).

With respect to the "unreasonable application" clause of § 2254(d)(1), the Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Williams*, 529 U.S. at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> . . . . [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409–11 (emphasis original).

With these principles in mind, the Court will turn to the examination of the claims raised in Mr. Peachman's petition for habeas relief.

## VI.   DISCUSSION

The respondent generously concedes that claims (1), (2), (3), (5), (7), and (8) are fully exhausted and that claims (4), (6), (9), and (10) are not. The petitioner does not address claims

(11) through (15) but, as discussed below, these claims were not fully exhausted in the petitioner's state proceedings.

### A. Exhausted Claims – Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that, in order to successfully claim that a lawyer's assistance was so ineffective as to violate the Sixth Amendment, a defendant must meet two requirements. "First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*

As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is *not* whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

#### (1) Failure to Ensure Plea Was Knowing and Voluntary – Claims (7) and (8)

In his petition in this Court, the petitioner argues that his trial attorney was ineffective for failing to fully explain to the petitioner the sentence he would receive for pleading guilty to second-degree murder and that, at the time he pleaded guilty, the petitioner believed he would serve the sentence "as a Standard Offender" with a 30% release eligibility date ("RED"), as was

indicated on the Plea Petition. The petitioner also asserts that, at the motion to withdraw his guilty plea, conducted on February 29, 2008, his trial attorney, Edward DeWerff,

> admitted under oath that he was unsure if he and Mr. Peachman ever discussed the possibility that his sentencing on the guilty plea for Second Degree Murder was to be served at the 100% range, and not at a 30% range. Further, Mr. DeWerff stated that he could not recall the exact conversation that took place between himself and Mr. Peachman, concerning whether the plea to second degree murder was going to be at 100%.

(ECF No. 1, at 5–6.)

The petitioner raised the same claims in his second-amended post-conviction petition (ECF No. 35-12, at 57.) Likewise, at the post-conviction hearing, the petitioner insisted that he was confused by the plea proceedings, believing on the basis of his attorney's representations and the plea paperwork that he was entering into an "open plea" to second-degree murder and that he would be sentenced to 15 to 25 years with a 30% RED. (*See* Post-Conviction Hr'g Tr., ECF No. 35-13, at 19.) He also pointed out that his plea petition had a checkmark by the box for 30% RED. (*See id.* at 20 ("In my plea paper I signed it was marked in the box 30 percent.").) The petitioner testified that he did not understand that he would have to serve 100% of his sentence until his mother explained it to him after he had already entered his plea. (ECF No. 35-13, at 26.)

Mr. DeWerff, the trial attorney, indeed testified at the post-conviction hearing that he had very little memory of the events concerning his client's entry of the plea, six years previously, and could only testify as to what his general practice was. (ECF No. 35-13, at 86 ("I do not have a specific recollection of, really, any conversation that I had with Mr. Peachman. It's been too long ago for me.").) He did not specifically recall his conversations with the petitioner concerning whether he would have to serve 100% of his sentence; he could, however, point to the transcript of the plea hearing showing that the judge informed the petitioner that he would

have to serve 100% of the prison term and the attorney confirmed that he had discussed that requirement with his client. (*Id.* at 87–88.)

The post-conviction court denied relief, finding as follows:

> Exhibit 5 is the [transcript of the hearing on the] plea of guilty entered on July 18, 2007. At page 13 of that exhibit, the court stated "and it is an open plea, with a range of punishment of fifteen to twenty-five years as a range one plea That is required as a violent offender, to serve at one hundred percent." Mr. DeWerff [trial counsel] then stated: "Yes sir, I have explained that to Mr. Peachman." . . . The court finds that the petitioner knew at the time of his plea that his sentence would be within the range of 15 to 25 years and that he would be required to serve it at 100%. There is no evidence whatsoever for ineffective assistance in relation to the plea.

(ECF No. 35-12, at 65–66.)

In addressing this claim in the petitioner's post-conviction appeal, the Tennessee Court of Criminal Appeals first articulated the standard for proving ineffective assistance of counsel, as established by the Supreme Court in *Strickland*. *Peachman II*, 2014 WL 2567136, at *4. The appellate court then noted that it had already considered the issue of whether the petitioner knew at the time he entered his plea that he would have to serve 100% of his sentence, in the context of the petitioner's claim on direct appeal that his plea was not knowing and voluntary.

Indeed, on direct appeal, the petitioner had raised a free-standing claim that his plea was not knowingly and voluntarily entered. The court rejected it, as follows:

> The law is well established that a guilty plea may be withdrawn if it was not knowingly, voluntarily, and understandingly made. *Boykin v. Alabama*, 395 U.S. 238, 242–44 (1969). A plea which is the product of "ignorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats" is not voluntary. *Id.* at 242-43. "[T]he core requirement of *Boykin* is 'that no guilty plea be accepted without an affirmative showing that it was intelligent and voluntary.'" *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Fontaine v. United States*, 526 F.2d 514, 516 (6th Cir. 1975)). When examining the voluntariness of a guilty plea, a reviewing court must consider the age of the defendant, the defendant's familiarity with the criminal justice system, the reasons for his decision to plead guilty, and whether the defendant was given ample opportunity to confer with counsel about all options available to him. Further,

before a plea may be considered knowingly and voluntarily entered, the defendant must be informed of the rights and circumstances involved and nevertheless choose to waive or relinquish those rights.

Defendant contends that his plea of guilty to second degree murder was not knowingly entered because of his misunderstanding of the amount of time he would have to serve before he is eligible for parole, and that such misunderstanding provides a "fair and just reason" for withdrawing his plea of guilty. . . .

The trial court found that the plea petition clearly "showed an open plea—100 RED 15–25 years," and that the erroneously checked box classifying Defendant as a "mitigated–30%" felony offender did "not amount to a showing to the court that Defendant misunderstood the direct statements" made to him by the trial court during the guilty plea submission hearing. . . .

At the guilty plea submission hearing, the trial court informed Defendant that he was entering an open plea to the lesser-included offense of second degree murder with a range of punishment of fifteen to twenty-five years, and that as a violent offender, Defendant was required to serve one hundred percent of his sentence. Trial counsel stated at the hearing that he had explained the length of time Defendant must serve his sentence, and Defendant agreed that he understood the terms of his plea. Defendant testified at the guilty plea submission hearing that he was guilty of second degree murder, and he believed it was in his best interest to enter a plea of guilty.

Based on our review, we conclude that the trial court did not abuse its discretion in denying Defendant's motion to withdraw his plea of guilty. Defendant is not entitled to relief on this issue.

*Peachman I*, 2010 WL 27880, at *5–6. In other words, the court had already determined as a factual matter that the petitioner knew at the time he entered his plea that he would have to serve 100% of the sentence and that the petitioner's plea was knowing and voluntary.

In the context of the post-conviction appeal, the court indicated that, because it had previously addressed the voluntariness claim, it would not revisit it on the merits. *Peachman II*, 2014 WL 2567136, at *4 (citing Tenn. Code Ann. § 40-30-106(h) for the principle that "[a] ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing"). In denying relief on the petitioner's post-conviction

ineffectiveness claim, the court implicitly determined that, because the plea was knowing and voluntary, counsel was not ineffective for failing to ensure that the plea was knowing and voluntary and the petitioner could not establish prejudice arising from any alleged deficiency in his attorney's conduct.

The question before this Court is whether the Tennessee court's decision in either *Peachman I* or *Peachman II* "was contrary to" clearly established federal law as pronounced by the United States Supreme Court, or "involved an unreasonable application of" such law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1) and (2). The petitioner has not shown that the appellate court's articulation of the law was incorrect in either appellate decision. More critically, the record fully supports the state courts' factual determinations.

As the state courts found, the actual plea petition states that the offense to which the petitioner was pleading guilty was the "reduced offense of 2 [degree] murder" and that it was an "open plea – 100% R.E.D., 15–25 years T.D.O.C." (ECF No. 35-1, at 15.) Under "Type Felony Offender," the box for "Mitigated – 30%" was checked, but the plea hearing transcript also reflects, as indicated above, that the trial court and the petitioner's attorney had explained to the petitioner that the sentence would be served at 100%. (Plea Hr'g Tr., ECF No. 35-5, at 13–14.) In the trial court's written order denying the petitioner's motion to withdraw the guilty plea, the trial court recognized that "someone" had erroneously checked the "Mitigated – 30%" box on the plea petition but held that, in light of the other evidence in the record, "[t]his check mark does not amount to a showing to the court that the defendant misunderstood the direct statements to him and the handwritten 100 RED." (ECF No. 35-1, at 23.) That finding is fully supported by the record. In particular, the fact that the petitioner's two written motions to withdraw his plea did

not actually raise the voluntariness issue supports a conclusion that the petitioner did not even become aware of the erroneous checkmark until sometime after he filed his motions to withdraw the plea and before the hearing on those motions.

In sum, despite the erroneously checked box on the plea petition, the Tennessee courts were not unreasonable in concluding that the petitioner understood at the time he entered his guilty plea that he would have to serve his sentence at 100% and that he would not be eligible for parole after service of only 30%. Consequently, the courts' determinations that the petitioner entered the plea knowingly and voluntarily, that counsel was not ineffective, and that the petitioner was not prejudiced by any alleged deficiency were not unreasonable. The petitioner is not entitled to relief on the basis of these claims.

### (2) *Failure to Provide Discovery – Claims (1), (2) and (3)*

In this Court, the petitioner asserts that his attorney (1) refused to let the petitioner hear the wire-tap tapes as the petitioner requested; (2) failed to provide the petitioner with any discovery information about the state's purported witness against him, D'Angelo Marquez Jenkins; and (3) failed to provide a complete copy of the state's discovery or the "opportunity to sit down with Counsel outside of the Courtroom environment, and go over or discuss the case and the evidence against him" (ECF No. 1, at 4).

In his post-conviction proceedings, the petitioner argued generally that trial counsel failed to provide him with "a full and complete copy of discovery" or to let him hear the tapes from the wire-tap worn by his cellmate, Jenkins, prior to the petitioner's entering his plea. (ECF No. 35-12, at 56; ECF No. 35-13, at 11, 14–15.) At the hearing, he conceded that he saw his co-defendants' and detectives' statements. He also admitted that he had met or spoken with his attorney many times prior to entering his plea. During cross-examination, he was unable to

articulate how the outcome of the proceedings was changed or how he was prejudiced by not getting additional discovery or hearing the wire-tap recording. (ECF No. 35-13, at 50–56, 65.) Trial counsel testified that his general practice would have been to provide all of the available "paper" discovery to his client but not the video or audio recordings, because the jail did not permit inmates to possess these items.

The trial court denied relief, finding that the petitioner had "seen most if not all of the discovery and that Mr. DeWerff discussed the case with him" and, consequently, that the petitioner could not show either that DeWerff's conduct fell below that required of defense counsel or that the petitioner was prejudiced as a result of any failing on the attorney's part. (ECF No. 35-12, at 66.) The appellate court affirmed on the basis that "[t]he petitioner could not point to any specific item that was not provided to him and that would have altered his decision to plead guilty." *Peachman II*, 2014 WL 2567136, at *5.

Again, the Tennessee court correctly articulated the relevant legal standard. The questions facing this Court are whether the Tennessee court's decision "involved an unreasonable application of" such law and whether the decision "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1) and (2). The petitioner has not pointed to any evidence in the record overlooked or misstated by the appellate courts, and the fact that the petitioner's trial attorney could not precisely remember his conversations with his client six years after they occurred does not negate the evidence in the record supporting the state courts' conclusion that the petitioner was provided all of the available paper discovery and that the outcome of the case would not have been altered if he had been provided additional items. This Court defers to the state courts' factual findings, since no significant countervailing evidence requires the conclusion that the trial court's findings were

unreasonable. *Accord Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("Deference [to the trial court's factual findings] is necessary because a reviewing court, which analyzes only the transcripts . . . , is not as well positioned as the trial court is to make credibility determinations."). The petitioner is not entitled to relief on the basis of claims (1), (2), or (3).

### *(3)*      *Dissatisfaction with Trial Counsel – Claim (5)*

In his petition in this Court, the petitioner argues that he "was never satisfied with the representation given by Counsel," that he had asked on more than one occasion that his counsel be relieved and that substitute counsel be appointed, and even went so far as to file a motion to withdraw his plea based on his attorney's failure to fully discuss or explain the evidence against him prior to entry of the plea.

The trial court construed this as a claim that the trial court erred in failing to grant the petitioner's motion for appointment of new counsel. The court noted that counsel had filed a motion to withdraw in May 2007, stating that the defendant had asked him to withdraw because he was "not even trying to work no good deals" and it was "crazy" that his co-defendants were getting prison terms of eight to twelve years, much less time than was being offered to him. (ECF No. 35-12, at 66.) The court held a hearing on the motion and denied it. In reviewing the petitioner's post-conviction motion, the court held that the petitioner had not provided any valid reason at the post-conviction hearing for why the court should have ordered defense counsel to withdraw. The appellate court affirmed, finding that "[t]he petitioner's claim that he and trial counsel 'were at odds' would not, even if true, avail the petitioner of post-conviction relief. The petitioner does not point to any action or inaction by trial counsel that qualifies as deficient performance."

Insofar as the petitioner argues that he and his trial attorney did not see eye-to-eye and that his motion for new counsel should have been granted, the petitioner fails to state a claim of constitutional dimension, for which relief could be granted by this Court. Even construed as a claim of ineffective assistance of counsel, the claim does not warrant relief, because the petitioner fails to articulate any specific action his attorney should have been failed to take, other than those already addressed herein. Again, the petitioner has failed to show that the state court's adjudication of this claim involved an unreasonable application of *Strickland* or was based upon an unreasonable determination of the facts in light of the evidence before the state court. The petitioner is not entitled to relief on the basis of this claim.

## B.     Defaulted Claims

Some of the remaining claims were raised in the petitioner's initial or amended post-conviction petition and even addressed at the post-conviction hearing, but none of them were fully and fairly presented to the highest available state court, that is, in the petitioner's post-conviction appeal, in satisfaction of § 2254(b)'s exhaustion requirement. The improperly exhausted claims are now barred from presentation in a state post-conviction petition by Tennessee's one-petition rule, Tenn. Code Ann. § 40-30-102(c) ("This part contemplates the filing of only one (1) petition for post-conviction relief. In no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment."), and by the state's one-year statute of limitations, Tenn. Code Ann. § 40-30-102(a). The petitioner has not presented any basis for overcoming these restrictions on his ability to further exhaust the claims in state court. The claim are therefore procedurally defaulted.

As set forth above, to obtain consideration of a defaulted claim, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the

alleged constitutional errors, or alternatively that failure to consider the claims would result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). In this case, the petitioner does not acknowledge that his claims are defaulted or assert cause to excuse the default. The claims are therefore barred from review in this Court and subject to dismissal on that basis. *Coleman*, 501 U.S. at 749.

## VI.    CONCLUSION

For the reasons set forth herein, Kenneth Peachman's petition under § 2254 will be denied and this matter dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

The Court finds that the petitioner has not made a substantial showing of the denial of a constitutional right with respect to his claims and that they do not merit further review. The Court will deny a COA.

An appropriate order is filed herewith.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT